**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| **v.** | * |
| | *   No.  16-cr-00267-11 (CCB) |
| **CORLOYD ANDERSON,** | * |
| **Defendant.** | * |

**DEFENDANT'S SENTENCING MEMORANDUM**

Corloyd Anderson, by his undersigned counsel, hereby respectfully submits this memorandum to aid the Court in determining a reasonable sentence.

Mr. Anderson respectfully requests that this Honorable Court impose a sentence of 120 months imprisonment, a sentence that falls within the properly calculated guideline range and satisfies the statutory mandatory minimum term. Such a sentence respects the jury verdict and takes into account the mitigating factors that include Mr. Anderson's family circumstances as a married man and the devoted father of three children, his relatively minor criminal history. It is a reasonable sentence and complies with the statutory mandate that a sentence be "sufficient, but not greater than necessary" to comply with the purposes of sentencing as required by 18 U.S.C. § 3553(a).

While Mr. Anderson stands convicted of participating in a RICO conspiracy, involving a violent gang, the Jury found that Mr. Anderson's participation did not involve the gang's violent conduct. Mr. Anderson's participation was limited to the heroin conspiracy, which albeit is a serious offense but for which the guideline range provide adequate punishment. The Jury rejected the Government's contention that Mr. Anderson was involved in any acts of violence or that any such acts were reasonably foreseeable to him. *See* Verdict Form, ECF 1174 (unanimous jury finding that no acts of violence – murder, extortion, robbery, witness tampering and retaliation – were

reasonably foreseeable to Mr. Anderson). Indeed, the Indictment did not even charge Mr. Anderson with any substantive crimes of violence. Nor do any of the 151 separate Overt Acts set out in the Indictment charge that Mr. Anderson engaged in any crimes of violence or provided a murder weapon, as the Government alleges in its Sentencing Memorandum. Again, contrary to the Government's arguments, the jury rejected any charge that Mr. Anderson was conspired to distribute crack cocaine or any drug other than heroin or that distribution of crack cocaine or other drugs was reasonably foreseeable to him. Verdict Form. The severity of Mr. Anderson's offense is therefore fully taken into account in the offense level calculation.

Mr. Anderson's criminal history consists of relatively minor prior offenses, fairly remote in time. At least one of those offenses involves a Baltimore City Police Officer who has been discharged from the force for cause. At the same time, Mr. Anderson is married to his childhood girlfriend and is the father of three children from that union, the youngest of which is 10 years old. In fashioning a sentence, the Court should take into account the adverse on Mr. Anderson's children were he to be sentenced to a lengthier term of imprisonment.

## INTRODUCTION

The jury did not convict Mr. Anderson of any violent crimes and did not find that any acts of violence – including murder, robbery, or witness tampering and retaliation – were foreseeable to him as a member of the RICO conspiracy. *See* Verdict Form, ECF 1174. While the Jury found Mr. Anderson guilty of the RICO conspiracy, the only racketeering activities it found that were foreseeable to him were a conspiracy to distribute and distribution of 1 kilogram or more of heroin. On the conspiracy to distribute drugs in Count 2, the jury similarly found him guilty only with regard

to heroin. The jury found that the other drugs charged both in the RICO conspiracy and in the drug conspiracy – cocaine, cocaine base (crack), fentanyl and marijuana – were not reasonably foreseeable to him.

The Jury's decision merits deference as it was reached after a six-week trial during which the Jury listened to fifty witnesses, considered thousands of exhibits, and accepted much of the Government evidence while rejecting evidence and witness testimony that was not credible. Under current law, the "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence" and the Court makes independent findings of facts. *See United States v. Watts,* 519 U.S. 148, 157 (1997). However, as the *Watts* Court noted there is "a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence." *Id.* Moreover, "as part of his appeal of the reasonableness of the sentence imposed" a defendant may challenge on appeal a district court's factual findings based on uncharged conduct as well as the extent of the district court's reliance on those findings. *United States v. Grubbs*, 585 F.3d 793, 799 (4th Cir. 2009).

Significantly, the precedential value of *Watts* is undercut by the fact that it was decided on the petition for certiorari, without "full briefing and consideration on the oral argument calendar." *Watts*, 519 U.S. at 171 (Kennedy, J, dissenting.). Moreover, as Justice Kennedy noted, there is a

> distinction between uncharged conduct and conduct related to a charge for which the defendant was acquitted" which "ought to be confronted by a reasoned course of argument, not by shrugging it off. At the least it ought to be said that to increase a sentence based on conduct underlying a charge for which the defendant was acquitted does raise concerns about undercutting the verdict of acquittal.

*Id.* at 170. Thus, if only to preserve the issue, Mr. Anderson objects to the use of acquitted conduct in any form on Fifth and Sixth Amendment grounds. To avoid these serious constitutional issues, the Court should interpret the relevant statutes, including 18 U.S.C. § 3553(a) and § 3661 and guideline provisions, including U.S.S.G. § 1B1.3 and § 6A1.3, to forbid the use of acquitted conduct at sentencing. *See Martinez v Clark,* 534 U.S. 371, 381 (2005) ("reasonable presumption that Congress did not intend [an] alternative which raises serious constitutional doubts").

In addition, in this instance, the application of the guidelines based solely on the jury's findings that Mr. Anderson was involved in a 1-kilogram heroin distribution conspiracy would result in a recommended sentence at or near the 10-year mandatory minimum applicable to such an offense. Yet, the Government asks the Court to impose a 25-year term of imprisonment based on the uncorroborated allegations made by unreliable witnesses and rightly rejected by the Jury and based on uncharged conduct. Such a severe sentence would be unreasonable under all the facts and circumstances in this case and would clearly be "greater than necessary" to comply with the purposes of sentencing as mandated by 18 U.S.C. § 3553(a)(6). Mr. Anderson thus objects to the Court's consideration under a preponderance standard of the uncorroborated allegations made by unreliable witnesses that form the basis of the Government's acquitted and uncharged conduct arguments. At a minimum, the Court should apply a clear and convincing standard to the uncharged and acquitted conduct if it is going to rely on those allegations to impose a sentence that is more than double the otherwise recommended sentence. *See, e.g.*, *United States v. Tucker*, 404 U.S. 443, 447 (1972) (defendant has a due process right not to be sentenced based on "misinformation of constitutional magnitude"); *see also Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948); *McMillan v. Pennsylvania,* 477 U.S. 79, 86-88 (1986) (heightened standard

rather than preponderance of the evidence at sentencing could be appropriate where the enhancement is a "a tail which wags the dog of the substantive offense."); *see also United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009), *cert. denied*, 559 U.S. 1022 (2010) (on plain error review, district court not required to apply a heightened standard of proof to uncharged conduct used as the basis for enhancing a defendant's sentence under the sentencing guidelines).

## I. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

### A. The Offense

The Offense conduct set out in the PSR is word-for-word the Government's theory of Mr. Anderson's participation in the offense, which ignores the unanimous verdict of the jury.[1]

> At trial, the government presented the following evidence proving that ANDERSON was a member of MMP who conducted and participated in the gang's affairs through a pattern of racketeering activity that included *murder*, conspiracy to distribute drugs, drug distribution, *witness tampering, and witness retaliation* in furtherance of the conspiracy

PSR ¶ 20 (emphasis added).

With respect to Mr. Anderson, the Jury unanimously rejected the charge that Mr. Anderson participated in the gang's affairs through a pattern of racketeering that included *murder, witness tampering and witness retaliation*. *See* Anderson Verdict Form, ECF 1174 (emphasis added). The Government's theory that Mr. Anderson participated in violence or supplied a murder weapon was

---

[1] The PSR explicitly noted that the information set out in ¶¶ 5- 28 was provided by the Government. *See* PSR at ¶4 ("the Government submitted the below procedural and factual summaries"). When it sent the Government's version of events to the Probation Officer, the Government provided a copy to Mr. Anderson's trial counsel.

based on uncorroborated testimony of incredible witnesses, who had previously lied to authorities or provided inconsistent statements; it is a theory that was not charged in the original or superseding indictments. It is a theory which the jury rejected and Mr. Anderson disputes.

Even with respect to the heroin conspiracy of which Mr. Anderson was convicted, it is significant that no heroin or drug paraphernalia were seized from Mr. Anderson, from his home, or from his place of business. No surveillance of him selling or supplying heroin to anyone exists. Despite the allegation that the drug business generated $100,000 weekly for MMP, Mr. Anderson has court-appointed counsel and no drug proceeds were recovered from him. The wire intercepts between ML and Mr. Anderson (PSR ¶ 26-27) at best relate to small-drug quantities and do not support a 1-kilogram conspiracy. Throughout its Sentencing Memo, the Government also argues that the "jury convicted Mr. Anderson of . . . one count of conspiracy to distribute . . . 280 grams or more of crack cocaine, in violation of 21 U.S.C. § 846." That is simply not correct. *See* Verdict Form, ECF 1174 at 2-3.

Mr. Anderson denies that he provided or helped hide the weapon used to murder Antoine Ellis on November 22, 2012. *See* PSR ¶ 23. W-1 who testified to this during the trial was shown to have lied to authorities about his own participation in violent crimes, which had been captured on a videotape; during debriefs and grand jury testimony, W-1 did not mention that Anderson had provided a weapon. W-1's story was not corroborated by any other evidence in the trial. The Indictment did not charge Mr. Anderson with the Ellis murder as a principal, aider and abettor, or accessory after the fact. No RICO overt act charged Mr. Anderson with any connection to this murder. *Compare* Count 1, RICO Overt Acts, ¶ 33(7) (referencing the murder). And, the jury necessarily rejected W-1's testimony when it found that murder was not a reasonably foreseeable

racketeering activity for Mr. Anderson.

Mr. Anderson denies that he had anything to do with the September 29, 2015 murder of Brian Johnson. *See* PSR ¶ 25. His jail visit on September 29, 2015 to Dante Bailey, who is his stepbrother, does not implicate him in the alleged murder. Presumably, the jail conversation between Bailey and Mr. Anderson was recorded and shows no evidence of Mr. Anderson's involvement. The jail visit by Mr. Anderson shortly after the alleged killer visited Bailey provides a false innuendo not a causal link to the murder. The Indictment did not charge Mr. Anderson with the Johnson murder as a principal, aider and abettor, or accessory. *See* Count 8 (charging Dontray Johnson with the Brian Johnson murder); Count 9 (charging Johnson with a § 924(c) count in connection with the murder). Again, no RICO overt act charges Mr. Anderson with any connection to this murder. *Compare* Count 1, RICO Overt Acts, ¶ 33(74) (referencing the murder). And, the jury necessarily rejected W-1's testimony when it found that murder was not a reasonably foreseeable racketeering activity for Mr. Anderson.

Mr. Anderson denies the allegations that he was a high-ranking member of MMP as set out in the PSR at ¶ 21. The four witnesses who testified to this were not credible and had provided inconsistent statements. For example, WB had denied his own participation in violent crimes, despite the existence of a video that proved his lie. JG had described Mr. Anderson as having "gold teeth," which is not true. DH and ML had each stated during earlier proffers that Mr. Anderson was not a member of MMP. *See, e.g.,* ROI 141 of ML at 3 (Anderson was not "official member" of MMP). The "gang writings" and "Gang paperwork" recovered from Bailey implicate Mr. Anderson only if, as the Government claims, aliases and generic names such as "Boss" and "Jim" in fact refer to Mr. Anderson, an allegation which he denies. The single social media photograph of Mr.

7

Anderson making 'gang signs' was for a promotional rap video. The screenplay written by Bailey which purports to describe Anderson as an MMP boss is a fictionalized memoir, not a confession or a statement of facts. A photograph taken of Mr. Anderson with Bailey and Banks, which depicted Banks wearing an MMP sweatshirt is not proof that Mr. Anderson was a member of MMP. PSR at ¶22. The 2012 photograph was taken "in the Unit Block of Custom House Avenue" which happens to be the location of Norma Jean's Club, an adult entertainment venue that Mr. Anderson was visiting with his step-brother Dante Bailey.[2] The $88,000 seized (PSR ¶ 24) from Mr. Anderson's relative at BWI Airport on February 15, 2014, was shown to be gambling proceeds from Maryland Live! Casino. Indeed, the authorities who seized the money returned it to Mr. Anderson after he was able to prove its provenance. *See* Anderson Trial Exhibit 15, "Stipulation re: Certified Records of Maryland Live! Casino"

Notwithstanding the Government's argument, Mr. Anderson is not "guilty" of being a felon-in-possession if the Court dismissed Count 24, pursuant to the Government's motion. A charge that is dismissed does not result in a finding of guilt.

### B. Mr. Anderson, Overcame an Impoverished and Difficult Childhood, to Become a Loving Father of Three and a Productive Member of Society

Corloyd Anderson was raised by a single mother. His father was altogether absent from his life. He was not there physically, emotionally or with financial help. Corloyd attended Baltimore City public schools and dropped out of school in the 10th grade. He later obtained a GED. He committed relatively minor criminal offenses while a young man. He was victimized by a corrupt

---

[2] Norma Jean's Club is located at 10 Custom House Avenue in Baltimore. It's website is readily found with a simple internet seach.

Baltimore City Police officer. In sum, Corloyd was primed to be another statistic.

But Corloyd overcame those beginnings. He has been in a loving relationship with the same woman for 20 years and they have three children together, a son who will be 18 years old this year; a daughter who is 13; and their youngest, a daughter who is 10. They were married in November 2015 and he is a loving father and family man. He attends the children's school and after-school activities. Their son plays football and hopes to attend college this year. His middle child takes dance, gymnastics and music classes. His youngest is a great soccer player, gymnast and dancer. Corloyd is an avid bowler, and member of a bowling league and has traveled out of town for tournaments. He and his family are members of the Empowerment Temple AME Church. He and his wife both own small businesses. She is a licensed cosmetologist and owns a beauty salon. He has history of steady employment. PSR at ¶¶ 89-92. He has been employed as a cook and as a warehouse man. He was also self-employed doing maintenance work and car repair and detailing. He incorporated a business "We Cater to You Motors in 2015, which included a mechanic shop, and provided repair and detailing businesses. He also purchased cars at auctions, repaired and resold them. He had several employees. PSR at ¶89.

The letters from family and friends describe a family man, who cares for his children and has strived to better himself. He is a kind person, who tries to help others in need. During a period of time, he became addicted to pain killers and other drugs after suffering a car accident. As he admitted to officers when he was arrested, he has from time to time sold drugs but he is not the violent man the Government paints him out to be.

### 1.     **Family Circumstances Merit Consideration**

The Court should take into account Mr. Anderson's family ties and three minor children in determining the sentence both as a function of the support the family provides to the defendant to avoid becoming a recidivist and in terms of the detrimental effect on the children that results from a defendant's incarceration. *See, e.g., See Rita v. United States,* 551 U.S. 338, 364-65 (2007) (family ties proper consideration under § 3553(a)); *United States v. Johnson*, 964 F.2d 124, 128-29 (2d Cir. 1992) (departure warranted based on "need for defendant to provide for and support his family both financially and emotionally"). Moreover, the fact that defendant's own conduct has contributed to his children's difficulties is not the issue when a variance based on family circumstances is requested; the focus is the effect on the children. *See United States v. Schroeder,* 536 F.3d 746 (7th Cir. 2008).

> When a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members. *See, e.g., United States v. Johnson*, 964 F.2d 124, 129 (2d Cir.1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing."). The defendant's responsibility for the adverse effects of his incarceration on his family is not the determinative issue. If it were, there would never be an occasion on which the court would be justified in invoking family circumstances to impose a below-guidelines sentence. The court was required to consider Schroeder's family circumstances argument and provide an adequate analysis of how much weight, if any, it should command. The fact that the consequences of incarceration are attributable to his own misconduct may be a factor in the analysis but it is not the sole factor nor is it dispositive.

*Schroeder,* 536 F.3d at 756.

## II.     Sentencing Guidelines

Mr. Anderson believes that his recommended sentencing range should be 108 to 135, based on an Offense Level 30 and a Criminal History II.

### A.     Offense Level

Based on the jury verdict (1-kilogram heroin), the base offense level is 30.[3] *See* PSR at ¶ 30.

#### 1.     Gun Bump in § 2D1.1(b)(1) Does Not Apply

Mr. Anderson objects to the application of a 2-level gun bump under U.S.S.G. § 2D1.1(b)(1) based on the firearm that was recovered from his home during a search in September 2016. During that search, the Government did not recover any evidence related to drug trafficking or the RICO conspiracy. Cases that apply the gun bump in drug trafficking offenses uniformly require, at a minimum, that other drug trafficking-related evidence be found at the same location where the gun is found or that drug sales or other drug-related activity took place at the location. *See, e.g., United States v. Harris,* 128 F.3d 850, 852 (4th Cir. 1997) *(*"proximity of guns to illicit narcotics can support a district court's enhancement of a defendant's sentence under Section 2D1.1(b)(1)"); *United States v. Nelson*, 6 F.3d 1049, 1056 (4th Cir.1993) (affirming weapon enhancement when handguns found in dwelling where drugs seized); *United States v. Rusher*, 966 F.2d 868, 880 (4th Cir.1992) (affirming weapon enhancement when drugs and handgun seized from same briefcase); *United States v. Apple*, 962 F.2d 335, 338 (4th Cir. 1992) (" undercover FBI agent had purchased and arranged for

---

[3] The guideline for a RICO conspiracy directs courts to apply the "greater" of offense level 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a). For Mr. Anderson, the underlying activity found by the Jury is a conspiracy to distribute and distribution of 1 kilogram of heroin. Accordingly, the offense level is found at U.S.S.G. § 2D1.1(c)(5) ("At least 1 KG but less than 3 KG of Heroin").

11

the distribution of narcotics with the Apples, often in meetings held at the Apples' New York City apartment" where the firearm was seized).

There is also insufficient reliable evidence to enhance Mr. Anderson's sentence on some theory of reasonable foresee ability that the conspirators possessed a firearm in connection with the drug conspiracy. First, Mr. Anderson was not charged with any acts of violence, nor named in any of the 151 racketeering acts that alleged acts of violence. *See* Superseding Indictment at ¶ 33, pp 13-41 (ECF 515). Second, the jury rejected any finding that murder, extortion, robbery, or witness tampering or intimidation was "reasonably foreseeable to [Mr. Anderson] in furtherance of the racketeering conspiracy." Jury Verdict Form at 1 (ECF 1174). Third, the Jury was right to reject the uncorroborated testimony of Government W-1 who testified that Mr. Anderson "supplied the murder weapon [used by Dontray Johnson to murder Antoine Ellis] and helped him dispose of it afterward." PSR at 23.[4] Fourth, with respect to the murder of Antoine Ellis by Dontray Johnson on September 29, 2015, it is noteworthy that despite the testimony of Government W-1 that Mr. Anderson supplied the murder weapon and helped dispose of it, the Grand Jury did not charge Mr. Anderson as a principal, aider and abettor, or an accessory in connection with that murder (Count 8); or with the possession, use or carry of a firearm in violation of 18 U.S.C. § 924(c) in connection with that murder (Count 9). Superseding Indictment at 49-50 (ECF 515). The Court should

---

[4] Mr. Anderson objects to the extent that the Government seeks to have the Court find that Mr. Anderson was involved in the murder of Brian Johnson based on the statement in the PSR at ¶25 that Mr. Anderson visited Bailey at the Baltimore County Detention Center shortly after Bailey had been visited by Dontray Johnson to report on the murder Brian Johnson. Paragraph 25 provides no basis for a finding of wrongdoing by Mr. Anderson. The statement amounts to rank innuendo that provides no basis for a causal link. Thus, it cannot form the basis of a sentencing enhancement. *See, e.g., United States v. Tucker*, 404 U.S. 443, 447 (1972) (defendant has a due process right not to be sentenced based on "misinformation of constitutional magnitude");

similarly find that W-1's uncorroborated testimony on this point is not sufficiently credible.

### 2. No Chapter Four Enhancements Apply

Mr. Anderson is not an Armed Career Criminal ("ACCA") nor a Career Offenders.[5] In light of *Rehaif v. United States*, 139 S. Ct. 2191 (2019), the Government has moved to dismiss Count 24, which charged a violation of 18 U.S.C. § 922(g). See ECF 1344. Thus, Mr. Anderson is not subject to an enhanced sentence pursuant to 18 U.S.C. § 924(e) ("ACCA").

Mr. Anderson is also not subject to a career offender enhancement pursuant to U.S.S.G. § 4B1.1, as he does not have two qualifying predicate felony convictions in light of *United States v. Norman*, 935 F.3d 232, 239 (4th Cir. 2019) (a drug conspiracy does not qualify as a "controlled substance offense" under U.S.S.G. § 4B1.2(b)). Thus, Mr. Anderson's offense level is not enhanced to Offense Level 37. This result makes sense. First, the Sentencing Commission itself has questioned the efficacy of using drug trafficking convictions, especially for retail-level traffickers, to qualify a defendant for career offender status. U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform 133-34 (2004). The Commission noted that the goal of incapacitating criminals was undermined since, unlike repeat violent offenders (who also qualify as career offenders), retail-level drug traffickers are readily replaced. Second, the career offender enhancement would overstate Mr. Anderson's culpability and the likelihood of recidivism as it would have been based on relatively minor street level drug offenses. *See, e.g.*, *United States v. Mishoe,* 241 F.3d 214 (2d Cir. 2001) (although priors involving street-level dealing cannot be the

---

[5] The enhancements described in the PSR at ¶ 40 do not apply.

13

basis for an automatic downward departure, district courts are authorized to depart upon consideration of a several factors, including, the amount of drugs involved in the prior offense, the amount of time previously served, the sentence previously imposed and the defendant's role in the prior offense). Lastly, Mr. Anderson's prior drug offenses are relatively minor, street level sales, which can form the basis of a downward variance.

> The test for "career offender" status is certainly no less fraught with potential imprecision. . . .This definition encompasses an enormous variety of crimes. The prior offenses must involve violence or controlled substances to count toward career offender status; nonetheless, there is clearly a potential for wide discrepancy in the gravity of past antisocial conduct among "career offenders."

*United States v. Adkins*, 937 F.2d 947, 952 (4th Cir. 1991) (district court may depart down where "career offender status overstates the seriousness of the defendant's past conduct").

### B.   Criminal History

The proper application of the Sentencing Guidelines places him in Criminal History II because at least one prior is stale or is subject to dismissal based on the fact that the Baltimore Police Officer involved in the arrest has been discharged from the department for cause. Alternatively, he should be in Criminal History Category II as a result of a downward departure pursuant to U.S.S.G. § 4A1.3 or a downward variance.

#### 1.   The Trespassing Conviction in Paragraph 48 Should Not Count

Section 4A1.2(e)(2) provides that "Any other prior sentence that was imposed within ten years of the defendant's commencement of the instant offense is counted." The trespassing offense set out in ¶ 48 is too old to count under § 4A1.2(e)(2). Mr. Anderson, who at the time was 20 years

old, received a sentence of 90 days on 12/17/2003 incarceration for trespassing. There is no substantial evidence that Mr. Anderson committed the instant offense in 2003. Accordingly, the 2-points assessed for this offense should not count. Alternatively, this offense should not count as there is no indication that Mr. Anderson was represented at the time and there is no description for the offense. PSR ¶ 48 (PSR reflects that there is "no case file information for this case"). Moreover, trespassing offenses never count unless the sentence imposed is 30 days or more. *See* U.S.S.G. § 4A1.2(c)(1). A 90-day sentence for a trespassing offense dating to 2003, which results in the assessment of 2-points is an over-represents the severity of the conduct and should result in no criminal history points as a proper application of the Guidelines or a downward departure/variance.

## 2. Offense in ¶ 50 Involves a Corrupt Baltimore Police Officer

Mr. Anderson objects to assessing criminal history points based on the Baltimore City conviction set out in the PSR ¶ 50. This conviction results from an arrest on 8/27/04, Case No. 204300034. Mr. Anderson is in the process of filing a Petition for Coram Nobis in the Circuit Court for Baltimore City to have the conviction vacated. This case involved BPD Officer Fabien Laronde, who has been discharged from the Police Department for cause.[6]

---

[6] One article on Officer Laronde states the following:

> Like the GTTF, earlier iterations of units like De Sousa's Anti-Crime Section were involved in troubling incidents. In 2013, Detective Kendall Richburg of the Violent Crime and Impact Section (VCIS), another plainclothes unit, was indicted on federal gun and drug charges. On a wiretapped phone call, Richburg discussed planting evidence and setting up people to be robbed – a precursor to the GTTF scandal. Just before Richburg's arrest the unit was renamed the Special Enforcement Section (SES), but retained many of the same officers. VCIS had come to the attention of the city council because of their tactics and volume of complaints. One of those officers was Fabien *Laronde*, who had a well-documented history of alleged misconduct including a questionable shooting, stealing, and witness intimidation. He was the

15

### 3. Criminal History Points for Stale, Minor Drug Offenses

Paragraphs 49 and 51 relate to relatively minor drug offenses for arrests dating to 2004 and 2005, nearly 15 years ago but combine for 4 criminal history points. The conviction involving Officer Laronde falls in the same category. The offenses do not qualify under the "staleness" provision only because of unspecified violations of probation or supervised release extended the probationary term. The conviction involving Officer Laronde falls under the same circumstances. In sum, these three offenses, which are nearly 15 years old and which involved minor drug offenses but count for 5 criminal history points clearly overstate the conduct.

| PSR ¶ | Date | Offense | Sentence | Points |
|---|---|---|---|---|
| 47 | 2003 | Possession of handgun | Suspended; 1-year for violation | 2 |
| 48 | 2003 | Trespassing | 90 days | 2 |
| 49 | 2004 | PWID | 1-year | 2 |
| 50 | 2004 | PWID | 6 days | 1 |
| 51 | 2005 | PWID | 6 days | 1 |

---

subject of civil lawsuits alleging illegal strip searches, assault, and even illegally detaining a man inside a courthouse. *BPD terminated Laronde in 2016.* Before his firing, Laronde said of the complaints against him that "it goes along with the type of proactive work I do." And before his assignment in the Anti-Crime Unit and his recent arrest, Larry Worsley was a District Action Team supervisor; he also worked with Wayne Jenkins of the GTTF and Laronde in the SES.

"Notoriously Brutal, Racist Plainclothes Policing Makes a Return in Baltimore" (emphasis added) by Larry Smith Jr., who "spent 18 years as an officer with the Baltimore Police Department, with stints in patrol, special enforcement units and, finally, Internal Affairs, where he investigated his fellow officers. He left the department, and law enforcement in general, in 2017." https://theappeal.org/authors/larry-smith/

In sum, all of Mr. Anderson's convictions date back to 2003 through 2005, when Mr. Anderson was a young man, 22 years old or younger. They were minor offense but count for 8 criminal history points. The trespassing offense and the corrupt officer offense should not count at all. PSR ¶¶ 48, 50. That would reduce the criminal history points to 5 and place him in Criminal History Category III. Even five criminal history points overstate the criminality and the Court should vary down to Criminal History Category II.

In criminal history category II, his sentencing range would be 108 to 135. In criminal history category III, the sentencing range would be 121 to 151.

If the Court were to apply the gun bump in U.S.S.G. § 2D1.1(b)(1), the range in Category II would be 135 to 168; in Category III, the range would be 151 to 188 months.

### III.    Purposes of Sentencing

A term of imprisonment of 10-years is a substantial sentence for a person like Mr. Anderson whom the jury found did not engage in any violent conduct and that no violent conduct was foreseeable to him. It is "sufficient, but not greater than necessary." It would avoid unwarranted sentencing disparities with heroin distribution cases. It would take into account his young children, whom he has raised and who need his love and care. It would recognize the decade or more when Mr. Anderson lived a crime-free life. There is no empirical evidence that a more severe sentence would serve any greater deterrent effect.

As shown by Mr. Anderson's life as a father, husband and contributing member of society, and the letters submitted on his behalf, Mr. Anderson merits an opportunity to rehabilitate himself.

For all these reasons, Mr. Anderson respectfully requests that the Court impose the mandatory minimum sentence of 10 years.

Respectfully submitted,

/s/

**Carmen D. Hernandez**
MD Trial Bar No. 03366
7166 Mink Hollow Rd
Highland, MD 20777
(240) 472-3391

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Mr. Anderson's Sentencing Memorandum was served via email on Government Counsel this 18th day of February, 2020.

/s/
**Carmen D. Hernandez**

18