IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Respondent, | * | |
| | * | CRIMINAL NO. LKG-16-0267 |
| v. | * | |
| | * | |
| CORLOYD ANDERSON, | * | |
| | * | |
| Petitioner. | * | |
| | * | |
| | ****** | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO
<u>VACATE UNDER 28 U.S.C. § 2255 (ECF 1971)</u>**

The defendant, Corloyd ANDERSON, a/k/a "Bo," was a high-ranking member of a violent Bloods gang known as Murdaland Mafia Piru, or MMP. He supplied large volumes of heroin to members of MMP for distribution in MMP's territory in Northwest Baltimore. He supplied a firearm to a fellow MMP member who used it to commit a murder, and he disposed of the firearm afterward. And he unlawfully possessed a loaded handgun after having been convicted of numerous prior felonies.

Following a roughly six-week trial, a jury convicted ANDERSON of one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); one count of conspiracy to distribute controlled substances (Count Two), in violation of 21 U.S.C. § 846; and one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g) (Count Twenty-Four). ECF 1174 (Verdict). With respect to the drug quantities involved in Counts One and Two, the jury found that one kilogram or more of heroin was reasonably foreseeable to ANDERSON in furtherance of the conspiracy. *Id.* at 2–3. On February 20, 2020, the district court sentenced ANDERSON to 264 months (22 years) in prison. ECF 1440 (Judgment).

In his petition, ANDERSON claims that he was deprived of his Sixth Amendment right to effective assistance of counsel because (1) his counsel failed to "adequately challenge the prosecution's use of testimony from confidential sources [who] lacked credibility"; (2) his counsel failed to challenge the use of GPS data "illegally acquired" from a Title III wiretap and used to support a "flawed search warrant" for ANDERSON's residence; and (3) his counsel failed to challenge the government's breach of a stipulation regarding ANDERSON's casino winnings during closing arguments. ECF 1971, at 4–5. Related to argument (3), ANDERSON also claims that there was "prosecutorial misconduct" because of the "breached stipulation." *Id.* at 5.

The petitioner's § 2255 motion should be denied. Contrary to ANDERSON's claims, his trial counsel—who was an experienced and effective advocate—*did* bring vigorous challenges with respect to all three issues he now raises. ANDERSON has not pointed to any deficiency in his counsel's performance, and he certainly has not shown that the outcome of the trial would have been different but for counsel's alleged errors. Furthermore, the Fourth Circuit has already rejected ANDERSON's claim of prosecutorial misconduct, finding that the prosecution did not breach the relevant stipulation.

## FACTUAL BACKGROUND

On September 22, 2016, ANDERSON and twenty-three other members and associates of MMP were indicted on charges of racketeering conspiracy, drug trafficking conspiracy, and various other offenses. ECF 46 (Superseding Indictment). Two defendants were added in a second superseding indictment returned on June 1, 2017. ECF 515 (Second Superseding Indictment). Twenty defendants pled guilty, three of whom cooperated and testified against their co-defendants. Six defendants, including ANDERSON, proceeded to trial in March 2019.

Over the course of the roughly six-week trial, the government called over 50 witnesses and introduced over 1,000 exhibits. On May 1, 2019, the jury convicted ANDERSON of one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); one count of conspiracy to distribute one kilogram or more of heroin (Count Two), in violation of 21 U.S.C. § 846; and one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) (Count Twenty-Four). ECF 1174 (Jury Verdict). With respect to the drug quantities involved in Counts One and Two, the jury found that one kilogram or more of heroin was reasonably foreseeable to ANDERSON in furtherance of the conspiracy. *Id.* at 2–3.

As stated in the Presentence Report ("PSR"), the government provided the following summary of facts proved at trial:

> Murdaland Mafia Piru ("MMP"), also known as the "Mob" or "Mobsters," was a violent subset of the Bloods gang that for many years controlled the drug trade in large swaths of Northwest Baltimore City and neighboring Baltimore County. MMP also had offshoots in East Baltimore City and other cities such as Washington, DC.
>
> MMP was descended from the Tree Top Piru (TTP) subset of the Bloods gang. TTP was formed in Compton, California in the 1970s and derived its name from a group of streets in Compton named after trees.
>
> In February 2008, the United States Attorney's Office for the District of Maryland indicted twenty-eight leaders of TTP on racketeering charges, effectively ending TTP's control in Maryland. According to MMP gang paperwork, the 2008 indictment "destroyed" TTP because it led to accusations of "snitching" and "creat[ed] separation between brothers." MMP was formed in response to the federal indictment and replaced TTP in Baltimore. Although MMP adopted some of the same practices as TTP, it developed its own unique ideology—in particular, an association with the terminology and symbols of the Italian Mafia, and a preoccupation with money and murder.
>
> The leader of MMP was Dante Bailey, who was referred to as the "Don" or "Godfather" of the gang. Bailey was responsible for writing and disseminating many of MMP's founding documents beginning in 2009 while he was incarcerated. After his release from prison in 2011, Bailey flew to California to meet with west coast leaders of TTP and gain their official approval for the MMP set in Maryland.

3

MMP was organized hierarchically, with a "Don" or "Godfather" at the top (Dante Bailey), and various "Bosses," "Underbosses," "Capos," "Lieutenants," and "Mobsters" underneath. According to MMP gang paperwork, some subordinates had specialized functions, such as the "Five-Star General," whose job was "training soldiers to defend our family," and the "Boss of All Bosses," whose job was overseeing the gang's finances and "orchestrat[ing] a dues system."

MMP members were required to follow certain rules of conduct. Members who violated these rules or who disobeyed an order from a superior were subjected to disciplinary measures called "sanctions," which ranged from fines or work assignments for minor violations, to physical beatings or stabbings for more serious violations, to murder for the most serious violations. Violations that were punishable by death included "[a]ny acts or attempted acts of treason" and "[a]ny co-operation with authorities that lead[s] to incriminating others." Other MMP rules included: "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill." MMP members enhanced their status within the gang by carrying out acts of violence against rivals; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob."

Prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code." MMP members were sometimes required to pay dues to the gang consisting of a portion of the proceeds of their criminal activities, and they were subject to reprisal—and sometimes murder—for failing to do so.

MMP operated street-level drug distribution "shops" in various locations in Baltimore City. These drug shops were operated by MMP members and associates and distributed heroin, cocaine, cocaine base (commonly known as "crack"), fentanyl, and marijuana, among other controlled substances. Non-members who wished to sell drugs in MMP's territories were forced to pay a "tax" or were targeted for violence by MMP members. MMP's primary drug shops were located in the 5200 block of Windsor Mill Road (which MMP considered to be its headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue. The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative due to its close proximity to Interstate 70, which made it easily accessible to drug customers driving from western Maryland and neighboring states. It was not unusual for MMP members and associates to sell over a kilogram of drug per week at this location, which could translate to over $100,000 in drug revenue per week.

MMP members and associates attempted to assume control over the legitimate businesses that operated in MMP's drug territories, including the BP gas station in the 5200 block of Windsor Mill Road. MMP members and associates frequently stashed drugs and firearms on the premises of this gas station and made drug sales at the gas pumps or within the store itself.

4

MMP members used social media websites such as Instagram, Facebook, and YouTube to assert their claim to particular drug territories, intimidate rival gangs and drug traffickers, enhance MMP's status, and enhance individual members' status within the gang. MMP members and associates posted photographs and rap videos to these social media websites in which they flaunted firearms and threatened to kill those who stood in the way of the gang.

In or about 2015, Dante Bailey formed the so-called "Black Blood Brotherhood," an alliance between MMP and other gangs in Baltimore City, primarily the Black Guerilla Family ("BGF"). In essence, the Black Blood Brotherhood functioned as an efficient market for contract killings. For instance, if a BGF leader wanted someone killed, he might pay Bailey to sub-contract the murder to a subordinate in MMP, or vice versa. By contracting out murders to members of other gangs, Bailey and other gang leaders made it more difficult for law enforcement to solve the murders and apprehend those responsible.

MMP members engaged in criminal activities in furtherance of the gang, including, but not limited to, narcotics trafficking, conspiracy to commit narcotics trafficking, murder, attempted murder, conspiracy to commit murder, assault, extortion, obstruction of justice, witness intimidation and retaliation, and money laundering. By participating in criminal activities in furtherance of the gang, particularly violent acts directed by the MMP leadership, MMP members earned respect from fellow members and maintained or advanced their position within the gang.

During the dates of the racketeering conspiracy, the members and associates of MMP included the Defendant, as well as Dante Bailey, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf," Dontray Johnson, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray," Adrian Jamal Spence, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ," William Banks, a/k/a "Trouble," Randy Banks, a/k/a "Dirt," Ayinde Deleon, a/k/a "Murda," a/k/a "Yin," Dominick Wedlock, a/k/a "Rage," a/k/a "Nick," Dwight Jenkins, a/k/a "Huggie," a/k/a "Unc," Jamal Lockley, a/k/a "T-Roy," a/k/a "Droid," Jacob Bowling, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred," Melvin Lashley, a/k/a "Menace," Devon Dent, a/k/a "Tech," William Jones, a/k/a "Bill," a/k/a "Smalls," Jarmal Harrid, a/k/a "J-Rock," a/k/a "PJ," Jamal Smith, a/k/a "Mal," a/k/a "Lil Mal," Tiffany Bailey, a/k/a "Tiff," Takuma Tate, a/k/a "Oop," a/k/a "Ook," Maurice Pollock, a/k/a "Reese," Shakeen Davis, a/k/a "Creams," Charles Blackwell, a/k/a "Ci- Bo," a/k/a "Lil Charlie," Kenneth Torry, a/k/a "Kenny," Delante Lee, a/k/a "Tay Tay," Jay Greer, a/k/a "Champagne," Sydni Frazier, a/k/a "Sid," a/k/a "Perry," and Malcolm Lashley, a/k/a "Spook."

At trial, the government presented the following evidence proving that ANDERSON was a member of MMP who conducted and participated in the gang's affairs through a pattern of racketeering activity that included murder, conspiracy to distribute drugs, drug distribution, witness tampering, and witness retaliation in furtherance of the conspiracy:

5

Four witnesses testified that ANDERSON was a high-ranking member of MMP who supplied large volumes of heroin to members of the gang for distribution. The government introduced social media photographs of ANDERSON making MMP gang signs with the gang's leader, Dante Bailey, and others. The government also introduced MMP gang paperwork from a number of locations that identified ANDERSON as a ranking member of the gang. For instance, gang writings recovered from Dante Bailey's iCloud account identified ANDERSON as a "Boss" of MMP.  Gang paperwork recovered from Dante Bailey's residence on July 3, 2015 identified "Jim" (an alias for ANDERSON) as a "Boss" of the 5200 block of Windsor Mill Road. An autobiographical screenplay recovered from Dante Bailey's residence on May 17, 2016 identified "Bo" (*i.e.*, ANDERSON) as a "Boss" of MMP and part of Bailey's "handpicked team." The screenplay also depicted "Bo" as someone who distributed heroin in the area of the 5200 block of Windsor Mill Road.

On October 18, 2012, ANDERSON was captured on a surveillance camera meeting with Dante Bailey and William Banks in the Unit Block of Custom House Avenue. Banks was wearing a sweatshirt that said "Murdaland Mafia."

On November 22, 2012, Dontray Johnson murdered MMP member Antoine Ellis, a/k/a "Poopy," at Dante Bailey's direction, shooting him multiple times in the head and body with a 9mm caliber firearm in the 2000 block of North Forest Park Avenue. Earlier that day, Johnson had posted a comment to his Facebook account saying "198 n risen"—a reference to that year's murder tally in Baltimore City. A witness (W-1) testified at trial that ANDERSON supplied the murder weapon to Johnson and helped him dispose of it afterward.

On February 15, 2014, ANDERSON attempted to send approximately $88,000 in drug proceeds to a drug supplier in another state using a courier. When the courier was intercepted by the Transportation Security Administration at the Baltimore/Washington International Airport, ANDERSON told law enforcement the money was his and claimed he had won it gambling at Maryland Live! Casino.

On September 29, 2015, Dontray Johnson murdered MMP member Brian Johnson, a/k/a "Nutty B," because he refused to pay gang dues Johnson was collecting for Dante Bailey. A few hours after the murder, Johnson visited Bailey at the Baltimore County Detention Center and recounted what happened. In a recorded conversation, Bailey approved the murder, saying "I told you about this . . . Blow a fucking head off! Blow another nigga's head off! I said I'm through. . . . Don't play with 'em. Make 'em scared!" Johnson assured Bailey he would continue enforcing the gang dues and ordering MMP members to "kick that money out." Certified business records from the Baltimore County Detention Center show that ANDERSON visited Bailey at the jail immediately following Johnson's visit on September 29, 2015.

6

> In July and August 2016, investigators conducted a court-authorized wiretap of a cell phone belonging to Jamal Lockley, a/k/a "T-Roy." Lockley was intercepted in numerous calls in which he arranged to get supplies of heroin from ANDERSON or to pay ANDERSON for heroin that had been supplied to him on consignment. For instance, on July 24, 2016, in wire call TT3-2922, ANDERSON complained that the money was short, and Lockley assured him, "We've been giving you everything every day." Lockley then added, "Let me try to get you another five tomorrow." On August 1, 2016, in wire call TT3-4398, Lockley told ANDERSON he was "[t]rying to see what we can scrape up" so he could purchase another supply of heroin. ANDERSON told Lockley he "definitely gotta holla at me today." On August 3, 2016, in wire call TT3-4910, Jacob Bowling, a/k/a "Jakey" (using Lockley's phone) told ANDERSON he needed to get a supply of drugs before the drug shop opened. On August 15, 2016, in wire call TT3-7455, ANDERSON again complained that the money "was a little off." Lockley retorted that he "counted it out" and "it was thirty-four fifty … I took fifty out and gave it to Charlie." ANDERSON expressed concern about Lockley talking too recklessly on the phone, saying, "Aight shut the fuck! … Goddamn yo! Why you get so dumb over the thing!"
>
> Lockley's calls with ANDERSON were interspersed with wiretap calls in which Lockley talked very explicitly about heroin transactions with customers. For instance, on July 26, 2016, in wire call TT3-3225, a drug customer complained about the quality of the heroin Lockley's hitter sold him. The drug customer said: "Your boy gave me what looks, appears to be straight up gravel." Lockley angrily retorted: "That ain't no damn gravel man. …It's what you need… Fuck you think we gonna burn you?" In wire call TT3-3354, a heroin customer told Lockley, "Hey the shit was good man. Be careful though 'cause my friend actually had to call an ambulance." Lockley asked "what color was it?" and the customer replied "it was kinda brown."
>
> On September 27, 2016, law enforcement officers executed a federal search warrant at ANDERSON's residence, where they recovered a loaded, stolen Glock 9mm firearm (serial number MNN356) and $2,500 in U.S. currency. In a post-arrest interview, ANDERSON admitted that the firearm was his, and he also admitted to dealing heroin. Special Agent David Collier of the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) testified at trial that the firearm had been manufactured outside the state of Maryland and had therefore traveled in interstate commerce. At the time of his arrest, ANDERSON was prohibited from possessing a firearm because he had previously been convicted of a crime punishable by more than a year in prison (a fact to which he stipulated at trial).

ECF 1242 (Amended PSR) (Under Seal), at 5–9.

Prior to sentencing, the Government dismissed the felon-in-possession count in light of the Supreme Court's intervening decision in *Rehaif v. United States*, 139 S. Ct. 2191 (June 21, 2019),

which held that a conviction under § 922(g) requires proof that the defendant knew he had previously been convicted of a crime punishable by more than one year in prison. *See* ECF 1346 (Government's Sentencing Memorandum) (Under Seal), at 8–9. Although the jury had not been instructed as to this knowledge element, the Government explained that ANDERSON was guilty of the § 922(g) offense as a factual matter. *Id.* Had *Rehaif* been decided before the Government rested its case, the Government would have presented proof that ANDERSON knew he was a felon, including ANDERSON's recorded post-arrest interview, during which he referred to his "previous gun charges" and admitted that he knew he was not allowed to possess firearms. *See id.* Under such circumstances, ANDERSON would have qualified as an Armed Career Criminal under 18 U.S.C. § 924(e) and faced a mandatory minimum of 15 years in prison and sentencing guidelines of 360 months to life. *Id.* at 10 n.1.

Sentencing took place on February 20, 2020. ECF 1511 (Sentencing Transcript). The district court determined that the base offense level was 30 under U.S.S.G. § 2D1.1(c)(5) because the quantity of drugs foreseeable to ANDERSON was one kilogram or more of heroin. *Id.* at 6–7; *see also* ECF 1242 (Amended PSR), at ¶ 34. The court applied a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) because the defendant possessed a firearm in connection with the offense. ECF 1511 (Sentencing Transcript), at 17–19; ECF 1242 (Amended PSR), at ¶ 35. The total offense level was therefore 32. ECF 1511 (Sentencing Transcript), at 19; ECF 1242 (Amended PSR), at ¶ 39.

ANDERSON had numerous prior criminal convictions, including three prior felony drug convictions, two handgun convictions, and an assault conviction. ECF 1242 (Amended PSR), at 10–16. These convictions scored six criminal history points, putting him in criminal history category III. ECF 1511 (Sentencing Transcript), at 19; ECF 1242 (Amended PSR), at ¶¶ 47–51.

Based on an offense level of 32 and a criminal history category of III, ANDERSON's advisory guidelines were 151 to 188 months. ECF 1511 (Sentencing Transcript), at 19.

Ultimately, the district court sentenced ANDERSON to an above-guidelines sentence of 264 months (22 years) in prison. In announcing the sentence, the Court explained that ANDERSON's offense was "very serious" because of "the nature of the gang and the extent of the drug dealing." *Id.* at 45. The Court pointed out that "heroin kills people" and "destroys people's families." *Id.* In particular, the Court noted the evidence introduced at trial that a customer had overdosed on heroin distributed by Jamal Lockley (whom ANDERSON supplied). *Id.* The Court also found the evidence showed that ANDERSON was "a reasonably high-ranking member" of the gang, and there was "abundant evidence" that ANDERSON was "aware of the general rules and conduct and the fact that there were shootings and murders." *Id.* at 47. Furthermore, the court found that ANDERSON's possession of "a loaded, stolen handgun … in connection with drug dealing" at the time of his arrest "raise[d] a possibility of violence just in itself." *Id.* at 47. In addition, Anderson had a "serious" criminal history with "a number of convictions that involve guns and drugs," and "these were not the mistakes of a young kid anymore." *Id.* at 47–48. The Court concluded that a sentence of 22 years was necessary to reflect the seriousness of the offense, afford adequate deterrence, protect the public, and avoid unwarranted disparities between ANDERSON and his co-defendants who had already been sentenced. *See id.* at 45–50.

ANDERSON appealed. ECF 1758. He argued that his convictions should be overturned because the evidence was insufficient, because the court failed to give a multiple conspiracies instruction, because of prejudicial spillover from the later-dismissed § 922(g) count, and because the prosecution breached a stipulation in closing arguments. *See United States v. Banks*, 104 F.4th 496, 516, 522 n.8 (4th Cir. 2024). He also argued his sentence was procedurally and substantively

9

unreasonable. *Id.* at 523–24. On June 12, 2024, the Fourth Circuit rejected his claims and affirmed his conviction and sentence in a published opinion. *See id.* ANDERSON filed a petition for certiorari, which the Supreme Court denied on November 12, 2024. ECF 1911.

On October 24, 2025, ANDERSON filed a motion to extend the one-year deadline to file a § 2255 motion, citing frequent lock-downs in the prison that had prevented him from accessing the library and preparing his motion. ECF 1961. The Court granted the motion. ECF 1965. Consistent with the extension, ANDERSON filed the instant § 2255 motion on December 1, 2025. ECF 1971.

## ARGUMENT

### I. Legal Background

The federal habeas statute provides four avenues by which a petitioner can seek to vacate, set aside, or correct his sentence. The petitioner must show:

(1) "that the sentence was imposed in violation of the Constitution or laws of the United States,"

(2) "that the court was without jurisdiction to impose such sentence,"

(3) "that the sentence was in excess of the maximum authorized by law," or

(4) that the sentence "is otherwise subject to collateral attack."

28 U.S.C. § 2255(a).

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998) (citing *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); and *Smith v. Murray*, 477 U.S. 527, 537 (1986)).

## II. The Defendant Was Not Deprived of Effective Assistance of Counsel

To obtain relief on a theory of ineffective assistance of counsel, a petitioner bears the burden of demonstrating (1) that he received ineffective assistance of counsel; and (2) that he was prejudiced by that ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984). To satisfy the first prong, a petitioner must prove that his attorney's conduct "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. As such, a petitioner is required to show that his counsel's performance was not "within the extremely wide range of professionally competent assistance." *Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000); *Strickland*, 466 U.S. at 687–88. Judicial review of an attorney's performance in this context is "highly deferential," and there is a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Strickland*, 466 U.S. at 689.

With respect to the second prong, a petitioner claiming ineffective assistance must demonstrate that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Fugit*, 703 F.3d 248, 259 (4th Cir. 2012) (quoting *Strickland*, 466 U.S. at 687–88). The petitioner has the burden of demonstrating his entitlement to relief under any theory, including that his lawyer was ineffective. *See United States v. Roane*, 378 F.3d 382, 404–05 (4th Cir. 2004).

Here, ANDERSON cannot meet his burden under either prong of *Strickland*. He cannot show that his counsel's performance was deficient, or that he suffered prejudice as a result of counsel's alleged unprofessional errors, for the simple reason that no errors were made.

### A. Defense Counsel Did Not Fail to Adequately Challenge the Testimony of Confidential Informants

ANDERSON claims his counsel "failed to adequately challenge the prosecution's use of testimony from confidential sources that lacked credibility and relevance, causing unfair trial." ECF 1971, at 4. ANDERSON does not identify any particular confidential sources, but he is most likely referring to co-defendant William Banks, who served as a confidential informant prior to being indicted and later pled guilty and testified as a cooperating witness at trial. To the best of undersigned counsel's knowledge, no other confidential sources testified at trial.

The record belies ANDERSON's claim of ineffective assistance. Banks was thoroughly cross-examined by six different defense attorneys, including ANDERSON's attorney, Elita Amato. *See* ECF 1358 (Trial Transcript, Mar. 21, 2019), at 184–205 (rigorous cross-examination by Ms. Amato). For instance, Ms. Amato elicited testimony that Banks "lied" and pinned a shooting on someone else "when it was really you," *id.* at 185; that Banks sold drugs, possessed guns, and led a "double life" during the period during which he was acting as a confidential informant, *id.* at 198, 200–04; and that Banks had formed the intent to murder a fellow member of the gang, *id.* at 196. Notably, even government counsel highlighted Banks' prior falsehoods on direct examination. *See* ECF 1357 (Trial Transcript, Mar. 20, 2019), at 221–23 (eliciting testimony that "you blamed a shooting that you committed on your friend" and "that was a pretty big lie").

ANDERSON does not identify any particular omission by his counsel in cross-examining Banks or explain how such an omission could have affected the outcome of the trial. Indeed, it is hard to imagine how Banks' testimony could have been subjected to more robust scrutiny. Ultimately, no amount of cross-examination could change the overwhelming evidence of ANDERSON's guilt in the form of wire calls, surveillance footage, cell phone messages, social media evidence, and the testimony of other witnesses. *See United States v. Banks*, 104 F.4th 496,

506, 518 (4th Cir. 2024) (describing the evidence of the defendants' guilt in this case as "extensive"). Therefore, this claim should be rejected.

### B. Defense Counsel Did Not Fail to Challenge the TIII Wiretap or Use of the GPS Evidence

As his second ground for relief, ANDERSON alleges "ineffective assistance of counsel" and "violation of due process" because, he claims: "USA relied on statements made by federal agent Timothy Moore regarding the knowledge of my residence and validity of evidence obtain[ed] from trash pulls, which were not disclosed to me or counsel, and the illegal and improper use of GPS data, which was obtained from Title III wiretap order, which data was illegally acquired and use[d] to support the flawed search warrant." ECF 1971, at 4.

ANDERSON is mistaken. Prior to trial, ANDERSON's attorney moved to suppress the fruits of a Title III wiretap on ANDERSON's cell phone (referred to as "TT4"), alleging a *Franks*[1] violation in the necessity section of the supporting affidavit. *See* ECF 786 (Reply in Support of Motion to Suppress); *see also* ECF 962 (Transcript of Motions Hearing, Aug. 24, 2018), at 59–60. The same affidavit was also used to obtain a Rule 41 warrant to collect GPS location information for ANDERSON's cell phone, TT4. *See id.*; *see also* ECF 786-3 (Order Authorizing Interceptions), at 7. Specifically, Ms. Amato alleged that the affiant, ATF Special Agent Timothy Moore, omitted material information when he stated that "trash runs" could not be employed because investigators were unaware of the location of ANDERSON's "actual residence or any place he regularly sleeps." *See* ECF 786, at 2 (quoting ECF 786-1, Affidavit in Support of Wiretap); ECF 962 (Transcript of Motions Hearing, Aug. 24, 2018), at 59–60. Ms. Amato pointed out that a different wiretap application by a different affiant for a phone belonging to a different

---

[1] *See Franks v. Delaware*, 438 U.S. 154 (1978).

13

subject noted that trash runs had been conducted at ANDERSON's residence in 2014 and 2015. *See id.*; *see also* ECF 786-2 (Excerpts of Baltimore County Wiretap Application for Cell Phone Belonging to Adrian Spence). Ms. Amato argued: "[C]learly law enforcement not only knew of the Anderson's address but conducted trash pulls at that very location." ECF 786 (Reply in Support of Motion to Suppress), at 2–3. According to Ms. Amato, the omission was material to the necessity determination for the Title III wiretap. *See id.*

At the motions hearing, the Government pointed out that the previous trash runs were conducted "two years earlier" by "members of a completely different law enforcement agency" (the Baltimore County Police Department), and that the address was only "suspect[ed] to be" ANDERSON's residence. ECF 962 (Transcript of Motions Hearing, Aug. 24, 2018), at 62. The government argued that the alleged omission was a "classic example of innocent mistake or negligence" that had "no bearing whatsoever on the probable cause or necessity determination" for the wiretap. *Id.*

Moreover, the Government explained that the *Franks* claim was moot because there were never any TIII interceptions over TT4, since ANDERSON switched his phone before the wiretap commenced. *Id.* at 61. The only information the Government was able to collect from TT4 was GPS location information obtained pursuant to the Rule 41 warrant, and the Government did not intend to use any of that GPS location information at trial. *Id.* Although the Government *did* include the GPS location information in the Rule 41 search warrant affidavit for ANDERSON's residence, the GPS location information was not necessary to the probable cause determination because, by that point, there was a wealth of other evidence tying ANDERSON to the residence—including Motor Vehicle Administration records and surveillance of ANDERSON coming and going from the residence. *Id.*; *see also* ECF 779-14 (Residential Search Warrant), at 91–92, 97.

14

Furthermore, the discussion of trash runs was relevant only to the necessity showing for the TIII wiretap. *See* ECF 962 (Transcript of Motions Hearing, Aug. 24, 2018), at 63. Whereas a TIII wiretap requires a showing of necessity, the Rule 41 warrant for GPS location information required only a finding of probable cause, not necessity. *See* Fed. R. Crim. Pro. 41(d)(1) ("After receiving an affidavit or other information, a magistrate judge … must issue the warrant if there is probable cause to search for and seize a person or property or to install and use a tracking device."). Therefore, the discussion regarding trash runs was irrelevant to the acquisition of the GPS location information. *See* ECF 962 (Transcript of Motions Hearing, Aug. 24, 2018), at 63.

The Court agreed with the Government that the motion to suppress the TT4 wiretap was moot because the Government did not intend to use any Title III interceptions from TT4. *See* ECF 875 (Memorandum Opinion), at 1. The Court also agreed that the search warrant for ANDERSON's residence was supported by probable cause, even after excluding the GPS location information from TT4. *Id.* at 2.

ANDERSON does not point to anything more his counsel could have done to challenge the district court's determination. The GPS location information was not acquired unlawfully, and in any event, it was not necessary to the probable cause determination for the residential search warrant. Any further argument on this point would have been futile, and likely counterproductive. *See Strickland*, 466 U.S. at 691 (counsel need not pursue inquiries that "would be fruitless or even harmful"). Accordingly, ANDERSON's *Strickland* claim does not pass muster.

To the extent ANDERSON intends to challenge the district court's ruling, that claim is procedurally defaulted because he did not raise it on direct appeal, and he cannot demonstrate "cause" or "prejudice" to excuse the default. *Bousley v. United States*, 523 U.S. 614, 622 (1998).

### C. Defense Counsel Did Not Fail to Challenge the Prosecutors' Statements in Closing Argument Regarding the Defendant's Casino Winnings, and there Was No Breach of the Stipulation

As his third ground for relief, ANDERSON argues that his "counsel failed to challenge the government breached the stipulation made about currency, agreed to during trial which caused prejudice to me during closing arguments." ECF 1971, at 5. Relatedly, ANDERSON claims that there was "prosecutorial misconduct" because of the "breached stipulation." *Id.*

Once again, ANDERSON is wrong. His counsel *did* object that the Government breached the stipulation in closing arguments. By way of background, the Government introduced evidence at trial that on February 15, 2014, ANDERSON's uncle, C.B., was stopped going through security at BWI Airport when it was discovered that he was carrying $80,000 cash in random denominations stuffed into two postal envelopes. ECF 1372 (Trial Transcript, Apr. 16, 2019), at 86–88, 94, 96. C.B. claimed his nephew had given him the money to use gambling in Vegas; however, C.B.'s airline ticket was for Houston, Texas. *Id.* at 91. ANDERSON then arrived at the airport and claimed that he had won the money gambling at a casino and had given it to C.B. to buy cars at an auction in Houston. *Id.* at 95–96. ANDERSON was able to produce genuine receipts from a casino that totaled close to $80,000. *See id.* at 95–96, 100–01. The parties also entered into a stipulation, reflecting that ANDERSON had won money at the casino on several occasions. *See* Exhibit 1 (Stipulation).

Consistent with the stipulation, government counsel argued in closing that even if ANDERSON had in recent months won a roughly comparable sum of money gambling, the casino would hardly have paid it in the manner in which the cash was discovered. ECF 1376 (Trial Transcript, Apr. 24, 2019), at 142. Government counsel argued that based on the totality of the

circumstances, there was a reasonable inference to be drawn that the cash at issue was drug proceeds and was being taken to Texas to buy a substantial quantity of narcotics. *See id.*

The government's other trial counsel returned to this issue in her rebuttal closing argument, saying, "the airport seizure . . . I do think it's important to consider the facts carefully." ECF 1378 (Trial Transcript, Apr. 29, 2019), at 114. Defense counsel objected and, at a bench conference, argued that the government should acknowledge that the money had ultimately been returned to ANDERSON after he provided receipts. *Id.* at 114–15. Government counsel did so, then addressed the suspicious circumstances of the seizure without objection by defense counsel until appellant ANDERSON suddenly yelled, "Tell 'em I got my money back!" *Id.* at 116–17. The Court then reminded the jury that it was a "temporary seizure," and it would be their recollection of the evidence that controlled. *Id.* at 117.

None of the comments by the two prosecutors were either inaccurate or improper. The objection made by ANDERSON's counsel during closing arguments was resolved with a bench conference and statements to the jury that addressed the concern. ANDERSON does not point to anything more his counsel could have done. The prosecution was entitled to highlight the suspicious circumstances surrounding the money seizure, and any further argument on this point would have been futile, and likely counterproductive. *See Strickland*, 466 U.S. at 691 (counsel need not pursue inquiries that "would be fruitless or even harmful").

Indeed, the Fourth Circuit rejected ANDERSON's claim on appeal that his convictions should be reversed because the Government's arguments contradicted the terms of the stipulation. As the Fourth Circuit explained: "We have considered the underlying facts, including the terms of the stipulation and the Government's argument at closing, and conclude that Anderson's argument is predicated on an interpretation of the stipulation that goes beyond its actual language. Moreover,

17

once Anderson objected at trial, he agreed to resolving his concern through clarifying statements to the jury, which were given. We therefore find no basis for reversing his convictions as a result of these circumstances." *Banks*, 104 F.4th at 522 n.8. That decision is the law of the case, and ANDERSON has not put forward any grounds to challenge it.

### III.     The Court Should Deny Anderson's § 2255 Motion Without a Hearing

In summary, the record demonstrates that ANDERSON's counsel was a skilled and effective advocate who vigorously pursued every potentially meritorious challenge to the government's evidence. ANDERSON certainly has not overcome the strong presumption that his attorney "rendered adequate assistance and made all significant decisions in the exercise of reasonable judgment." *Strickland*, 466 U.S. at 689. Nor can he establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88. Accordingly, his claims should be denied.

Because the record conclusively shows that ANDERSON is not entitled to relief, the Court should deny ANDERSON's motion without a hearing. *Raines v. United States*, 423 F.2d 526, 529 (4th Cir. 1970); 28 U.S.C. § 2255(b).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that ANDERSON's petition be dismissed or, in the alternative, denied.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

___/s/___
Christina A. Hoffman
Assistant United States Attorney
36 S. Charles Street, Fourth Floor
Baltimore, Maryland 21201

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I filed an electronic copy of the foregoing motion via CM/ECF and caused a paper copy to be mailed, postage prepaid, to:

> Corloyd Anderson, # 62442-037
> FCI McKean
> P.O. Box 8000 Unit BA
> Bradford, PA 16701

/s/
Christina A. Hoffman
Assistant United States Attorney
